IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

PAUL PENKALSKI,

                           Plaintiff,                           OPINION AND ORDER

    v.                                                              12-cv-168-wmc

TANNER GERSTNER,

                          Defendant.

---

In this suit under 42 U.S.C. § 1983, plaintiff Paul Penkalski brings false arrest and unlawful arrest claims under the Fourth Amendment against defendant Officer Tanner Gerstner based on his arrest on May 19, 2010. Plaintiff contends that: (1) there was no probable cause to effectuate an arrest, resulting in his false arrest claim; and (2) there were no exigent circumstances to justify a warrantless arrest inside of his residence, resulting in his unlawful arrest claim. Both sides have moved for summary judgment. (Dkt. ##13, 17.)   For the reasons explained fully below, the court will (1) grant Gerstner's motion for summary judgment on the false arrest claim, finding no genuine issue of material fact that probable cause existed, and (2) grant Penkalski's motion for summary judgment on the unlawful arrest claim, finding no genuine issue of material fact that Gerstner's warrantless arrest inside Penkalski's apartment violated his constitutional rights. All that remains of this case for trial, therefore, is the damages award, if any.

In addition to those motions, the court will treat Penkalski's submissions as a renewed motion for assistance in recruiting counsel and will grant that request, finding

that the rigors of trial will exceed Penkalski's abilities.  Accordingly, the court will extend the deadlines for pre-trial submissions to allow for the recruitment of counsel.

UNDISPUTED FACTS[1]

**The Parties**

Penkalski was a student at the University of Wisconsin-Madison for at least some of the time period relevant to this suit.  Until his membership was revoked in 2004, Penkalski was also a member of the Wisconsin Memorial Union.  In July of 2009, the Wisconsin Memorial Union Director Mark Guthier successfully obtained a temporary restraining order and eventual temporary injunction against Penkalski.  The injunction was effective from August 24, 2009, through July 3, 2010, and provided that Penkalski was not to be on the grounds of the Wisconsin Memorial Union for any purpose.

Defendant Tanner Gerstner was a police officer for the University of Wisconsin Police Department ("UWPD") from 2008 until May 2013.  Officer Gerstner's duties at the UWPD included, but were not limited to, routine patrol, preliminary investigations, traffic regulation and investigative responsibilities.

---

[1]  Plaintiff Paul Penkalski originally proposed to sue a number of defendants, all employees or individuals affiliated with the University of Wisconsin, Dane County Circuit Court and the Dane County District Attorney's office, alleging a variety of claims over a several year period of time.  Proceeding *in forma pauperis*, Penkalski was ultimately granted leave to proceed on his Fourth Amendment claims for false arrest and unlawful arrest against Officer Tanner Gerstner.  While many of Penkalski's proposed facts and responses to defendant's proposed facts are arguably material to his larger story, they are not material to the particular claims remaining in this lawsuit.  As such, the court focuses on the events surrounding Penkalski's May 19, 2010, arrest.  Unless otherwise mentioned, the facts below are undisputed.

**Alleged Violation of the Injunction and Decision to Arrest**

On May 19, 2010, Officer Gerstner was dispatched to the Wisconsin Memorial Union in response to a report from a staff member that Penkalski had been spotted on the premises of the Union in violation of the injunction.  Penkalski had reportedly been riding his bicycle in the parking lot adjacent to the Union when he was identified by a staff member who had multiple prior contacts with Penkalski.

Sergeant Kerri Miller had already responded to the report when Officer Gerstner arrived at the Union to provide assistance.  Miller informed him that Penkalski had violated the injunction.  Miller and Gerstner both reviewed the injunction as well as a map provided by the Union staff with an outline of the "Union grounds."[2]  That map included the parking lot adjacent to the Union as part of the "Union grounds."  Sergeant Miller, therefore, advised Officer Gerstner that there was probable cause to arrest Penkalski for violating the injunction and that arresting Penkalski was the appropriate action.

**The Arrest**

While Gerstner had never arrested Penkalski before, he had past professional contacts with Penkalski during patrols, and he had also been made aware of Penkalski's activities during UWPD briefings.   Based on this knowledge, Gerstner knew of Penkalski's history of intimidation and aggression toward the UWPD, and that Penkalski was viewed as a possible threat.

---

[2] As discussed below, the map provided by the Union staff did not reflect the exact area subject to the injunction.

Officer Gerstner and another UWPD officer, Officer Plisch, went to Penkalski's home to arrest him.  Penkalski lives in the upper flat of a two-apartment house, which can be accessed via a narrow inside staircase with a ninety degree left turn near the top.  The hallway outside of Penkalski's apartment is approximately four feet wide.  After entering the house through the front door and an inner door, Officer Gerstner knocked on Penkalski's apartment door, which Penkalski opened.[3]  Gerstner then asked Penkalski to step into the hallway to talk, but Penkalski refused.  Gerstner then asked if he could come into the apartment to talk, which Penkalski also refused.  Instead, Penkalski repeatedly asked the officers why they were at his apartment.  According to Gerstner, Penkalski also became increasingly agitated and argumentative.[4]

At this point, Penkalski began to retreat into his apartment and close the door.  Penkalski had one hand on the door knob and was shutting the door when Gerstner stopped the door from closing and pushed the door open further to prevent Penkalski from completely shutting the door.  Gerstner then acknowledges that he stepped approximately two feet past the threshold of the door, informed Penkalski that he was

---

[3] The second door into the home is normally locked but the fact that this second door was unlocked is not material because there is no dispute that the arrest occurred inside of Penkalski's apartment.  Additionally, there is no reasonable expectation of privacy in common areas of multiple dwelling buildings.  *Harney v. City of Chi.*, 702 F.3d 916, 925 (7th Cir. 2012).

[4] Penkalski disputes the claim that he was agitated and argumentative, stating that he was in fact polite and not hostile to Officer Gerstner. (Pl.'s 2nd Add'l PFOFs (dkt. #36) ¶ 20.)  This proposed finding of fact was submitted without leave of court with his reply brief in support of his motion for summary judgment.  While the court could disregard these facts, the court has considered them in the interest of justice, at least where material and not duplicative of Penkalski's earlier submissions.

under arrest, and proceeded to handcuff him.  Penkalski contends that Gerstner was at least four and a half to five feet inside of his apartment at the time of his arrest.  This dispute, however, is not material to the parties' motion for the reasons explained below. Gerstner represents that he was concerned for officer safety due to the fact that he could not see Penkalski's hands behind the door, and through his experience, people often keep a weapon such as a baseball bat or shotgun behind the door.

The parties agree that after his arrest, Penkalski asked to be released in order to get the map that related to the injunction, as well as his keys to lock his door.  Gerstner refused both requests, he claims out of concerns for safety.  Gerstner did ask if Penkalski would consent to his retrieving the apartment keys to lock the door but Penkalski refused.  Gerstner then placed Penkalski in the squad car and drove him to the Dane County Jail for booking.

OPINION

## I.  Motion for Summary Judgment

At the summary judgment stage, the evidence is not to be weighed and the truth is not to be determined.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986).  Summary judgment is appropriate if the judge finds there is a no genuine issue of material fact for trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The evidence of the non-moving party is to be believed as true and all inferences are to be drawn in the non-moving party's favor.  *Anderson*, 477 U.S. at 255.  If the judge finds that no rational jury or trier of fact could find for the non-moving party, even when all inferences are drawn in the

5

non-moving party's favor, summary judgment should be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 599 (1986). The burden of showing that there is no disputed issue of material fact lies with the moving party. *Celotex Corp.*, 477 U.S. at 322. In this case, there are cross motions from both parties for summary judgment for both the false arrest and unlawful arrest claims. The court will consider each of plaintiff's claims in turn.

### A. False Arrest Claim

Both parties have moved for summary judgment on Penkalski's false arrest claim. Plaintiff contends Gerstner lacked sufficient knowledge to conclude that there was probable cause at the time of the arrest in violation of his constitutional rights under the Fourth Amendment. Not surprisingly, defendant contends that there was probable cause for the arrest, the existence of which precludes a § 1983 suit for false arrest.

In order to prevail on a false arrest claim, plaintiff bears the burden of establishing that the officer lacked probable cause for the arrest. *Mucha v. Vill. of Oak Brook*, 650 F.3d 1053, 1056 (7th Cir. 2011). Probable cause exists if "at the time of the arrest, the facts and circumstances within the officer's knowledge are sufficient to warrant a prudent person . . . [to] believ[e] . . . that the suspect has committed, is committing, or is about to commit an offense." *Id.* (quoting *Gonzalez v. City of Elgin*, 578 F.3d 526, 537 (7th Cir. 2009)). Here, Wis. Stat. § 813.125 (2008) prohibits violations of injunctions and § 813.125(6) states that a police officer *shall* arrest and take a suspect into custody if (1) a police officer determines that an injunction exists, and (2) the officer has probable cause to believe that the injunction was violated. Moreover, only a "probability or substantial

6

chance" of criminal activity is required to establish probable cause, not a higher standard of proof. *Mucha*, 650 F.3d at 1057. Additionally, hindsight should not be taken into account; probable cause is based solely on the information the officer knew at the time of the arrest. *Id.*; *see also Harney v. City of Chi.*, 702 F.3d 916, 922 (7th Cir. 2012).

Because reasonable mistakes can happen, the probable cause standard "allows room" for mistakes. *Abbott v. Sangamon Cnty., Ill.*, 705 F.3d 706, 714 (7th Cir. 2013). At the time of the arrest, it is about "what the police know, not whether they know the truth that matters." *Woods v. City of Chi.*, 234 F.3d 979, 987 (7th Cir. 2000) (quoting *Kelley v. Myler*, 149 F.3d 641, 647 (7th Cir. 1998)). Moreover, the objective standard in evaluating probable cause is one from the "perspective of a reasonable person in the position of the officer," not based on any officer's purported or actual subjective motivations. *Abbott*, 705 F.3d at 714; *Tebbens v. Mushol*, 692 F.3d 807, 819 (7th Cir. 2012).[5]

In this case, Gerstner relied upon (1) the report of the Union staff member; (2) the fact that the Union staff member made the report via an emergency call system; (3) the map provided to him by the Union staff; (4) the wording of the injunction; and (5) the probable cause determination by his supervising officer. Given the totality of these

---

[5] In particular, Penkalski also points to the history of tension between himself and the UWPD as a basis for bias on the part of Officer Gerstner. Penkalski's submissions of facts repeatedly allege harassment both by the UWPD as well as Gerstner specifically. In addition, Penkalski's original complaint cites to a multitude to incidents between the Union and himself. While it is possible that this history of tension between Penkalski and both the Union and the UWPD could have created a bias, such "lengthy and ongoing dispute[s] culminating in the altercation . . . do not render . . . [a] report [as] incredible as a matter of law" and do not require Gerstner to disregard the report by the Union staff member solely because a bias against Penkalski may exist. *Harney v. City of Chi.*, 702 F.3d at 923 (quoting *Spiegel v. Cortese*, 196 F.3d 717, 724 (7th Cir. 2000)).

five facts, as well as the circumstances generally, plaintiff has failed to raise a genuine issue of material fact regarding Officer Gerstner's objectively reasonable judgment that Penkalski had committed a crime and that probable cause for Penkalski's arrest existed.

Specifically, Gerstner reasonably relied on the Union staff member's account, which was called in via an emergency call system, to report Penkalski on the Union's premises.  To determine if an informant's tip or report should be given value in assessing probable cause, the court considers the totality of the circumstances, including the informant's veracity and basis of knowledge, as well as the probability that the informant has given a substantial basis for probable cause.  *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983).

Here, the informant's purported ability to identify Penkalski, the informant's knowledge of Penkalski's past interactions with the Union and the injunction, as well as seeing Penkalski riding his bicycle in the Union parking lot firsthand all weigh in favor of crediting the report.  Additionally, the fact that the Union staff member made an emergency call adds to the reasonableness of assigning value to the report and the veracity of the staff member.  *Navarette v. California*, 134 S. Ct. 1683, 1689 (2014) (finding that it was reasonable to rely on an anonymous 911 call about a traffic incident to establish probable cause for a stop).

Gerstner also reasonably relied upon the map provided by the Union staff to determine what constituted "Union grounds" in the language of the injunction.  A reasonable officer in the position of Gerstner would have relied upon this map given to him by one of the parties of the injunction.  Additionally, Gerstner and Sergeant Miller

8

were provided copies of the injunction and, from these materials, the term "Union grounds" could reasonably be interpreted to include the parking lot immediately adjacent to the Union building, just as shown on the map they were provided.

Finally, Gerstner relied upon the statements by his supervisor who had been the first officer to respond to the dispatch. Sergeant Miller informed Officer Gerstner that based upon the statements from the Union staff, as well as the language of the injunction and map provided by the Union staff, there was probable cause to arrest Penkalski for violating the injunction. Miller and Gerstner also decided together that the best course of action was to arrest Penkalski. *Holmes v. Vill. Of Hoffman Estates*, 511 F.3d 673, 680 (7th Cir. 2007) (officer entitled to rely on information from fellow law enforcement officer).

Penkalski nevertheless points out that in fact: (1) he was *not* barred by the injunction from riding his bicycle in the Union parking lot; and (2) the map provided to Gerstner by the Union staff was not the map associated with the injunction. There is, however, *no* evidence that either Gerstner or Miller knew this and, under all the circumstances, it was a reasonable mistake by the officers to rely upon the information provided them. *Abbott,* 705 F.3d at 714 (explaining that reasonable mistakes are allowed within the framework of the probable cause standard).

While Penkalski also claims he had the map associated with the injunction in his apartment and that Gerstner refused to look at it, or even to call his supervisor at UWPD to verify that the area where Penkalski was reportedly bicycling was prohibited by the injunction, an officer is not required to investigate every claim of innocence

independently once probable cause is established. *Baker v. McCollan*, 443 U.S. 137, 145-46 (1979); *Matthews v. City of E. St. Louis*, 675 F.3d 703, 707 (7th Cir. 2012). For the reasons explained above, probable cause existed to arrest Penkalski when Gerstner arrived at his residence. Therefore, Gerstner had no constitutional obligation to allow Penkalski to fetch the map that he claimed would exonerate him, much less to set Penkalski free to do so.

In light of the totality of the facts and circumstances known to Officer Gerstner at the time of Penkalski's arrest, a reasonable officer would find a substantial chance or probability that he had violated the injunction and was subject to arrest. Penkalski's arguments and evidence fail to raise a genuine issue of material fact as to whether Gerstner lacked probable cause. Therefore, no reasonable jury could find that probable cause did not exist at the time of Penkalski's arrest. Because the existence of probable cause precludes a § 1983 suit for false arrest, *Morfin v. City of E. Chi.*, 349 F.3d 989, 997 (7th Cir. 2003), the court will grant defendant's motion for summary judgment on that claim.

### B. Unlawful Arrest Claim

Both parties also move for summary judgment on Penkalski's unlawful arrest claim. Plaintiff claims that defendant violated his Fourth Amendment rights by arresting him in his home without either consent to enter and without a warrant. It is undisputed that Penkalski did not give Gerstner to consent to enter. Defendant, however, contends that exigent circumstances existed, overcoming the warrant requirement.

10

As a general matter, it is presumptively unreasonable for a police officer to enter a suspect's home without consent or a warrant.  U.S. Const. amend. IV; *Payton v. New York*, 445 U.S. 573, 576 (1980).  In order to overcome this presumption both (1) probable cause and (2) exigent circumstances must be present.  *Payton*, 445 U.S at 587-88.  For reasons already provided, the court has determined that probable cause existed. Therefore, the sole issue is whether exigent circumstances justified Gerstner's warrantless entry into Penkalski's residence.

Warrantless entry for exigent circumstances may be constitutional when "there is a compelling need for official action and no time to secure a warrant."  *Pichany*, 687 F.2d at 209.  In order to prevail on an unlawful arrest claim, the plaintiff must show that there are no emergency exceptions to the warrantless entry rule.  *Welsh v. Wisconsin*, 466 U.S. 740, 750 (1984).  Some exceptions include hot pursuit of a suspect, prevention of destruction of evidence, an emergency situation such as a fire, or a situation in which the lives of the officers or others are threatened.  *Id.*; *United States v. Pichany*, 687 F.2d 204, 209 (7th Cir. 1982).  Factors to take into account when determining if exigent circumstances exist include "probable cause to believe that . . . factors justifying entry were present[,] . . . risk of danger, the gravity of the crime, and the likelihood that the suspect is armed."  *Minnesota v. Olson*, 495 U.S. 91, 100 (1990).  Here, all of these factors militate in plaintiff's favor.

In order to determine if sufficient exigent circumstances exist to justify a warrantless entry, the court must apply an objective standard of reasonableness under the totality of the circumstances that there was a compelling need to enter without taking the

11

time to obtain a warrant. *Sutterfield v. City of Milwaukee*, 751 F.3d 542, 557 (7th Cir. 2014). Exigent circumstances are rarely found to exist when the suspected offense is a minor one with "no violence or threats of [violence]." *Welsh*, 466 U.S. at 750-51.

As for a compelling need, Gerstner points to (1) Penkalski's failure to cooperate; (2) Penkalski hiding behind the door; (3) Penkalski displaying aggressive behavior; and (4) Penkalski's history of unpredictable behavior in the past with the UWPD. In particular, Gerstner credibly represents that a police officer's inability to see both of a suspect's hands is potentially one of the greatest threats to a police officer's life. (Def.'s Reply (dkt. #32) 12; *see also* Declaration of Tanner Gerstner ("Gerstner Decl.") (dkt. #16) ¶¶ 22, 29). Gerstner adds that through his experience as a police officer, people often keep a weapon such as a baseball bat or shotgun behind the door, and since both of Penkalski's hands were out of sight, he could have potentially been reaching for a weapon. (Gerstner Decl. (dkt. #16) ¶ 25).

Even crediting Gerstner's claim that a police officer's inability to see both of a suspect's hands is one of the greatest threats to the police officer's safety, the court is unaware of any case law that would treat this alone as rising to the level required for exigent circumstances, at least where there is *no* evidence that Gerstner had reason to believe Penkalski was armed *and* Gerstner had an obvious route of safe retreat, rather than moving forward to block the door from closing. If anything, Gerstner's affirmative action to block the door from closing increased his risk of injury, including being shot had Penkalski been armed.

12

Indeed, cases finding exigent circumstances based on the risk of danger to the suspect or others involve significantly greater threats.  In *Sutterfield v. City of Milwaukee*, 751 F.3d 542 (7th Cir. 2014), exigent circumstances were found to exist due to an emergency situation -- Sutterfield's psychiatrist called 911 to report that she had just left the office after admitting to suicidal thoughts.  *Id.* at 546.  The police officers found Sutterfield in her home, refusing to open her door.  *Id.* at 547.  Due to concerns for Sutterfield's life, the police entered the house without a warrant and placed Sutterfield into emergency protective custody.  *Id.*  The court noted that if the officers were acting to protect life or prevent serious injury, warrantless entry could be justified.  *Id.* at 548.

Here, there were *no* threats to the life and safety to the officers, others or Penkalski himself.  Indeed, not only had there been no violent acts, there were no violent statements or threats made.  The only threat Gerstner clamed to perceive was Penkalski not having both hands visible and trying to close the door.  *Contrast United States v. Martin*, 613 F.3d 1295, 1303-05 (10th Cir. 2010) (holding that a man refusing to show his hands and stating that he "had something on him" was sufficient to establish exigent circumstances); *United States. v. McNeal*, 77 F.3d 938, 946 (7th Cir. 1996) (finding exigent circumstances where a man who was suspected of multiple violent crimes had repeatedly made violent threats and intimidated others with a gun); *United States v. Hicks*, 389 F.3d 514, 527-28 (5th Cir. 2004) (finding exigent circumstances where a man was suspected to have committed a violent crime and the officers reasonably believed he was still armed and dangerous).

13

As to the lack of time to obtain a warrant, the arrest occurred long after Penkalski had left the Union, where the alleged violation of the injunction had originally occurred and Gerstner made the decision to arrest. Gerstner had from the time he left the Union and drove to Penkalski's apartment to obtain a warrant. Even after Penkalski refused Gerstner consent to enter his apartment, he could have left the apartment, obtained a warrant and returned to conduct the arrest.

Finally, the nature of the offense weighs in favor of a finding of lack of exigent circumstances. In *Welsh v. Wisconsin*, 466 U.S. 740, 742 (1984), a vehicle was observed driving erratically before swerving off the road into a field, where the driver exited and abandoned the vehicle. Police officers entered the man's house and went to his bedroom in order to give him a breathalyzer. *Id.* at 742-43. On these facts, the United States Supreme Court found no emergency that could be characterized as exigent circumstances, especially because the suspected offense was "relatively minor" and involved "no violence or threats of [violence]." *Id.* at 750-51. Warrantless entries based on suspicion that a minor offense has been committed, even when probable cause exists, should "rarely be sanctioned" due to the belief that police officers should not be permitted to "indiscriminately invade" based solely on suspicions. *Id.* at 751, 753.

If anything, the facts are even less compelling here. Violating an injunction order by riding a bicycle in a parking lot hardly rises to the level of a serious crime and involved no violence or express threats of violence. Indeed, in comparing the present case to *Welsh,* a violation of an injunction is a much less serious offense than driving under the influence, which the court held to be a minor offense. Similarly, *Welsh* offered a more

14

compelling need for acting without a warrant, since there was at least a risk of loss of evidence.

Ironically, had Gerstner simply announced that Penkalski was under arrest when he opened the door and stood on the threshold -- assuming Penkalski was standing on the threshold -- Penkalski would have no case, even if he retreated slightly inside. *See Sparing v. Vill. of Olympia Fields*, 266 F.3d 684, 689-90 (7th Cir. 2001) (describing legality of threshold arrests). But there is no dispute Gerstner chose instead to try to persuade Penkalski to come outside or invite him in. When Penkalski declined, Gerstner had no other option under the Fourth Amendment except to obtain an arrest warrant, which he failed to do.

Viewing the facts in the light most favorable to plaintiff, a reasonable jury would have to find that plaintiff's constitutional rights were violated. Indeed, even if the jury accepts Gerstner's perception of Penkalski's demeanor and furtive actions at the doorway, exigent circumstances did not exist to barge into his home. As such, the court will grant plaintiff's motion for summary judgment on his claim that Gerstner unlawfully entered his home without consent or a warrant in violation of the Fourth Amendment.[6]

---

[6] Defendant does not raise the issue of qualified immunity, but even if he had, the court would find that he was not entitled to it under such stark circumstances for the same reasons as set forth above. The right to protection against warrantless entries, if an exception does not apply, is well-established, and Gerstner was aware or reasonably should have been aware of this right through his training as a police officer.

15

## II. Recruitment of Counsel and Remaining Issues

Plaintiff previously requested assistance in recruitment of counsel, which the court denied.  (Dkt. ##12, 18.)   In his summary judgment submissions, plaintiff again complains about his *pro se* status and the limitations that places on his ability to prosecute this action.   And in a recent filing, Penkalski again requests that the court provide an attorney.  (Dkt. #39.)   To date, Penkalski has managed to articulate his claims and marshal evidence in support of them.   Still, in light of the tone and caustic approach of Penkalski's filings and his self-described anxiety and stress, the court acknowledges some concern that he would be materially limited at trial in testifying without the assistance of counsel, eliciting direct testimony from others in his case-in-chief, and perhaps most importantly, cross-examining defendant.  *See Pruitt v. Mote*, 503 F.3d 647, 655 (7th Cir. 2007) (*en banc*) (instructing courts to consider whether the legal and factual difficulty of the case exceeds the plaintiff's demonstrated ability to prosecute it).   However, the only remaining issue for trial is an award of damages to plaintiff for violation of his Fourth Amendment rights.

In light of the limited scope of trial, and the fact that recruited counsel will be able to seek reimbursement of reasonable fees and costs pursuant to 42 U.S.C. § 1988(b), the court hopes to recruit counsel for Penkalski in time to submit pre-trial filings and still try this case the week of August 3, 2015.  The court, however, will ease the deadlines.  Final pretrial submissions and disclosures are now due on July 15, 2015, and responses are due July 22, 2015.  The Procedures Governing Final Pretrial Submissions (dkt. #11 at pp.21-22) otherwise remain in place.  The court will also hold a telephonic conference on July

10, 2015, at 10:00 a.m. to ensure that this case will be ready to try the week of August 3, 2015.[7]

ORDER

IT IS ORDERED that:

1) Defendant Tanner Gerstner's motion for summary judgment (dkt. #13) is GRANTED as to plaintiff Paul Penkalski's false arrest claim and DENIED as to plaintiff's unlawful arrest claim.

2) Plaintiff Paul Penkalski's motion for summary judgment (dkt. #17) is DENIED as to plaintiff's false arrest claim and GRANTED as to plaintiff's unlawful arrest claim.

3) Plaintiff Paul Penkalski's motion for assistance in recruiting counsel (dkt. #39) is GRANTED.

4) The parties' respective motions to stay (dkt. ##38, 39) are GRANTED IN PART AND DENIED IN PART. The trial date remains in place. Final pretrial submissions and disclosures are now due on July 15, 2015, and responses are due July 22, 2015.

5) The court will hold a telephonic conference on July 10, 2015, at 10:00 a.m. Counsel for defendant to arrange the call to chambers at 608-264-5087.

Entered this 29th day of June, 2015.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge

---

[7] The court anticipates that this trial will only last one day. There is another civil trial also set to try the week of August 3, 2015. Therefore, this case may not try on Monday, August 3, but will try some day that week.